UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ILLINOIS TOOL WORKS INC., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 20-cv-10856-DJC |
| DAVID M. BALES and UNIVACCO FOILS EAST CORPORATION, | ) ) ) ) | |
| Defendants. | ) ) ) | |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                                                           **June 24, 2020**

### I.     Introduction

Plaintiff Illinois Tool Works Inc. ("ITW") has filed this lawsuit against David M. Bales ("Bales") and Univacco Foils East Corporation ("Univacco") (collectively, "Defendants") seeking injunctive relief in connection with Bales's employment with Univacco. D. 1. ITW alleges breach of contract (Count I), breach of the covenant of good faith and fair dealing (Count II), tortious interference with contractual relations and advantageous business relations (Count III and IV) and unfair competition in violation of Mass. Gen. L. c. 93A (Count V). D. 1. ITW has moved for preliminary injunction enjoining Bales from providing services to Univacco, Univacco from employing Bales and enjoining them both from diverting business from ITW. D. 3. For the reasons discussed below, the Court DENIES ITW's motion for injunctive relief, D. 3.

## II.     Standard of Review

The Court recognizes that preliminary injunctive relief "is an 'extraordinary and drastic remedy.'"  Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011) (quoting Munaf v. Geren, 553 U.S. 674, 689-90 (2008)).  To obtain such relief, the Court must consider:  (1) the movant's likelihood of success on the merits; (2) the likelihood of the movant suffering irreparable harm; (3) the balance of equities; and (4) whether granting the injunction is in the public interest.  Corp. Techs., Inc. v. Harnett, 731 F.3d 6, 9 (1st Cir. 2013).  Likelihood of success on the merits is the "main bearing wall of this framework."  W Holding Co. v. AIG Ins. Co.-Puerto Rico, 748 F.3d 377, 383 (1st Cir. 2014) (quoting Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 16 (1st Cir. 1996)) (internal quotation marks omitted).  Irreparable harm, on the other hand, is measured "on a sliding scale, working in conjunction with a moving party's likelihood of success on the merits, such that the strength of the showing necessary on irreparable harm depends in part on the degree of likelihood of success shown."  Gedeon v. City of Springfield, No. 16-cv-30054-MGM, 2017 WL 4212334, at *8 (D. Mass. Feb. 24, 2017) (quoting Braintree Labs., Inc. v. Citigroup Global Mkts., Inc., 622 F.3d 36, 42-43 (1st Cir. 2010)).  The plaintiff "bears the burden of establishing that these four factors weigh in [its] favor."  Esso Standard Oil Co. (P.R.) v. Monroig-Zayas, 445 F.3d 13, 18 (1st Cir. 2006).

## III.    Factual Background

The following facts are drawn from the complaint, D. 1, Plaintiff's motion papers, D. 3, the Defendants' opposition, D. 14, and the parties' supporting filings.  ITW is a diversified manufacturer of specialized industrial equipment, consumables and related services.  D. 6 ¶ 3.  Among its businesses, ITW is in the foil business whereby it manufactures, markets, sells and

distributes foils, films and foil laminates throughout the United States and internationally. D. 6 ¶ 4. Univacco, like ITW, also is in the foil business whereby it is engaged in the sale, manufacture and production of specialized foils, films and laminate products. D. 14 at 1. The foil market is relatively small with six manufacturers in North America, including ITW and Univacco, and twenty large companies that comprise the major customer base for this market. D. 14-5 ¶¶ 10-12. As a result, ITW and Univacco service some of the same customers and compete for foil business. D. 14-5 ¶ 13.

### 1. Bales's Work at Foilmark, Inc. and ITW

On or around July 19, 2001, Bales began working at Foilmark, Inc. ("Foilmark"). D. 14-4 ¶ 3. As part of his hiring, on or about that day Bales executed the "Non-Disclosure Agreement and Assignment of Inventions" (the "2001 Agreement").[1] D. 6-1. The 2001 Agreement included various provisions regarding the disclosure of confidential information including obligations triggered by the termination of employment. D. 6-1. The 2001 Agreement contained a section called "Competition" which prohibits certain competition by the employee during and after the course of their employment. D. 6-1 at 3-4. Relevant to this suit, subsections (b) and (d) of this section provide:

> (b) As long as Employee is employed by the Company and for a period of one year after the termination of such employment for any reason; Employee shall not . . . participate, directly or indirectly, in any capacity, in any business or activity which is in direct or indirect competition with the Company or the Corporate Group, or which otherwise provides any products or services similar to any products or services provided or proposed to be offered by the Company or the Corporate Group at the time of such termination . . . .

---

[1] Bales attests that he has no recollection of discussing the 2001 Agreement with any member of Foilmark management or signing the 2001 Agreement, D. 14-4 ¶¶ 5-6, but does not appear to question the authenticity of his signature on the agreement. D. 6-1 at 6. Accordingly, for the purposes of resolves of ITW's motion, the Court assumes that Bales executed the 2001 Agreement even if he has no recollection of doing so.

> (d) As long as Employee is employed by the Company and for a period of one (1) year after the termination of such employment for any reason, Employee shall not divert or attempt to divert from the Company or the Corporate Group the business or patronage of any of the clients, customers or accounts or prospective clients, customers or accounts that were served or solicited by the Company or the Corporate Group.

D. 6-1 at 3-4. The 2001 Agreement also states it "shall be binding upon the Employee irrespective of the duration of the Employee's employment by the Company, the reasons for the termination of the Employee's employment by the Company, or the amount of the Employee's salary or wages." D. 6-1 at 5.

ITW acquired Foilmark in a stock-sale transaction earlier in 2001 and formally merged Foilmark into ITW in September 2001. D. 6 ¶ 7. From 2001-2018, Bales worked exclusively in the sales of ITW foil products. D. 14-4 ¶ 7; D. 6 ¶ 8. While working in foil sales for ITW, Bales was responsible for managing customer relationships, handling sales, marketing and other business communication with ITW customers and prospective customers. D. 6 ¶ 9. Although Bales remained in foil sales through 2018, his compensation structure and job duties changed several times. D. 14-4 ¶¶ 8-12, 15. ITW requested that Bales certify and reaffirm each year from 2005-2019 his compliance with ITW's Statement of Principles, including the obligation to protect ITW's confidential information, D. 5-1 at 4, 11, but ITW did not request Bales to certify or reaffirm compliance with the 2001 Agreement, D. 14-1 ¶¶ 6, 13.

In or around March 2013, ITW added California to Bales's sales territory. D. 14-4 ¶ 11. Pursuant to this change, Bales executed an Employee Commission Agreement (the "2013 Agreement") with ITW that, among other things, outlined his new compensation structure. D. 14-4 ¶ 12; D. 14-1. The 2013 Agreement includes in its recitals a provision that the 2013 Agreement is "intended to complement, and will not supersede or replace any of the terms or conditions of EMPLOYEE's employment as set forth in the COMPANY's employee handbook,

4

written protocols, policies and procedures, or any written employment offer or agreement." D. 14-1 at 2.  The 2013 Agreement also includes an integration provision which provides: "[t]his Agreement constitutes the entire agreement of the parties and supersedes all prior agreements, understandings and contracts between the parties with respect to the subject hereof." D. 14-1 at 5.  The 2013 Agreement does not include a non-compete provision and does not reference the 2001 Agreement.  See D. 14-1.

Effective on or around December 31, 2018, ITW altered the compensation structure for its sales representatives by increasing the base salary sales representatives received and transitioned to a sales incentive bonus program.  D. 14-4 ¶ 15.  After this change, Bales experienced a substantial reduction in his net compensation.  D. 14-4 ¶ 16.  Around the same time as this compensation change, Bales changed divisions within ITW.  D. 14-4 ¶¶ 17, 22.

Beginning in January 2019 and through Bales's resignation earlier this year, he moved from the ITW Foils Division to the ITW Security Division.  D. 14-4 ¶¶ 22-26.  ITW changed Bales's job description to reflect this change and he ceased working in the Foils Division altogether.  D. 14-4 ¶ 24.  In the Security Division, Bales no longer worked with any clients or contacts from the Foils Division and the products he sold did not overlap with the Foils Division. D. 14-4 ¶ 26, 28.  The Foils and Security Divisions appear to be distinct and separate divisions— each maintaining its own website.  D. 14-2; D. 14-3.  As a result of this change, during the last year of Bales's employment at ITW, he had no contact with ITW foil customers and made no ITW foil sales.  D. 14-4 ¶ 29.

### 2. *Bales's Employment with ITW Ceases*

On January 6, 2020, Bales resigned from ITW effective two weeks later on January 17, 2020.  D. 14-4 ¶ 30.  At Bales's exit interview with human resources on January 17, 2020, he

requested copies of any and all agreements during his time at ITW. D. 14-4 ¶ 33. He did not receive this information from Human Resources or anyone else at ITW. D. 14-4 ¶ 33. Upon his resignation, Bales returned his ITW-issued laptop, ITW paperwork and ITW property including the cellphone he used while working for ITW. D. 14-4 ¶¶ 34-36. Bales attests that he did not retain, provide or in any way disclose any ITW proprietary information to any party including Univacco. D. 14-4 ¶ 39.

### 3. Bales's Employment with Univacco

On January 27, 2020, Bales began working at Univacco as a sales representative. D. 14-4 ¶ 39; D. 6 ¶ 21. Univacco directly competes with ITW in the sale of foils. D. 6 ¶ 21. ITW learned in February and March 2020 that Bales had reached out to three of its customers, American Greetings Corporation ("American Greetings"), Arkay Packaging Corporation ("Arkay") and Neff Packaging Solutions ("Neff") on behalf of Univacco to sell Univacco foil products. D. 8 ¶¶ 6-7; D. 7 ¶ 5. Univacco had pre-existing customer relationships with all three companies before Bales joined Univacco. D. 14-5 ¶¶ 14-18. In his employment with Univacco, Bales has only had contact with customers with pre-existing relationships with Univacco. D. 14-4 ¶ 40.

## IV. Procedural History

On May 5, 2020, ITW instituted this lawsuit, D. 1, and on that same day moved for a preliminary injunction against Bales and Univacco. D. 3. The Court heard the parties on the pending motion and took the matter under advisement. D. 23.

## V. Discussion

### A. ITW Has Not Shown a Likelihood of Success on the Merits on its Claims

Although the Court considers all factors of the preliminary injunction analysis, "[t]he *sine qua non* of this four-part inquiry is likelihood of success on the merits: if the moving party cannot

demonstrate that [it] is likely to succeed in [its] quest, the remaining factors become matters of idle curiosity." New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002); see Boathouse Grp., Inc. v. TigerLogic Corp., 777 F. Supp. 2d 243, 248 (D. Mass. 2011). ITW seeks to demonstrate likelihood of success on the merits on two of its claims: breach of contract against Bales and tortious interference with contractual or advantageous business relations against Univacco. D. 4 at 10-18.

### 1.  *Likelihood of Success Against Bales*

To succeed on its breach of contract claim, ITW must demonstrate that the parties reached a valid and binding agreement, Bales breached the terms of that agreement and ITW suffered damages as a result of the breach. See Michelson v. Digital Fin. Servs., 167 F.3d 715, 720 (1st Cir. 1999). Defendants argue that ITW cannot show a likelihood of success on the merits on this claim because the 2001 Agreement is no longer operative and enforceable. D. 14 at 9-13. Specifically, Defendants argue that Bales's substantial employment changes during his twenty-year tenure evidences the parties' abandonment of the 2001 Agreement.[2] D. 14 at 9-13.

"It is well-settled under Massachusetts law that '[e]ach time an employee's employment relationship with the employer changes materially such that they have entered into a new employment relationship a new restrictive covenant must be signed.'" Iron Mountain Info.

---

[2] ITW was not a party to the 2001 Agreement and Defendants argue that ITW, therefore, cannot enforce the Agreement. D. 14 at 9. While, "the majority of courts have concluded when considering this issue, in a merger, the right to enforce the restrictive covenants of a merged corporation normally vests in the surviving entity," OfficeMax Inc. v. Cty. Qwick Print, Inc., 709 F. Supp. 2d 100, 111 (D. Me. 2010), courts have declined to enforce these agreements where the merged companies materially differ, see Rent-A-PC, Inc. v. March, No. 13-cv-10978-GAO, 2013 WL 2394982, at *3 (D. Mass. May 28, 2013). As it is not apparent to this Court based on the current record that Foilmark and ITW were materially different companies, and the Court otherwise holds that ITW has not shown a likelihood of success on the merits, the Court does not need to reach this issue.

Mgmt., Inc. v. Taddeo, 455 F. Supp. 2d 124, 133 (E.D.N.Y. 2006) (alterations in original) (quoting Lycos, Inc. v. Jackson, No. 20043009, 2004 WL 2341335, at *3 (Mass. Super. Ct. Aug. 25, 2004) (applying Massachusetts law)); see Cypress Grp, Inc. v. Stride & Assocs., Inc., No. 036070BLS2, 2004 WL 616302, at *3 (Mass. Super. Ct. Feb. 11, 2004) (same). The Supreme Judicial Court articulated this principal in F. A. Bartlett Tree Expert Co. v. Barrington, 353 Mass. 585 (1968) where the court found that the restrictive covenant was unenforceable because relevant and substantial changes—namely the rate of compensation and sales area—indicated that the parties had "abandoned their old arrangement and had entered into a new relationship" rendering the previous restrictive covenant inapplicable. Id. at 587. The key issue in this regard is "whether the employment agreement had been 'mutually abandoned and rescinded,'" which depends upon the intention of the parties. Astro-Med, Inc. v. Nihon Kohden Am., Inc., 591 F.3d 1, 16 (1st Cir. 2009) (quoting Intertek Testing Servs. NA, Inc. v. Curtis-Strauss LLC, No. 98903F, 2000 WL 1473126, at *6 (Mass. Super. Ct. Aug. 8, 2000)).

In determining whether there was a material change, courts consider whether the parties signed a new agreement and if so whether the agreement references the old agreement, whether there have been material changes in compensation and whether the employee's job description and duties materially changed. See Iron Mountain Info. Mgmt., Inc., 455 F. Supp. 2d at 133-37 (considering compensation changes and efforts by the employer to have its employee sign a new agreement as evidence that the material change in the employment relationship voided the restrictive covenant); AFC Cable Sys. Inc. v. Clisham, 62 F. Supp. 2d 167, 173 (D. Mass. 1999) (considering benefit changes, job duty changes and title changes and holding that these changes coupled with the employer's effort to have the employee sign a new non-compete "make it clear that [the employee] had entered a new employment relationship with [the employer] thereby

voiding" the previous agreement). Courts have been reluctant to grant injunctive relief where there have been substantial changes in employment. See Grace Hunt IT Sols., LLC v. SIS Software, LLC, No. SUCV201200080BLS1, 2012 WL 1088825, at *4 (Mass. Super. Ct. Feb. 14, 2012) (explaining that "Massachusetts courts have consistently refused to grant injunctive relief or otherwise enforce restrictive covenants where such covenants were entered prior to changes in the employment relationship") (internal citations omitted).

Here, the 2001 Agreement provides that it "shall be binding upon the Employee irrespective of . . . the amount of the Employee's salary or wages." D. 6-1 at 5. Accordingly, although Bales went through several salary fluctuations during the course of his employment, these changes were anticipated as a commissioned-based worker and, therefore, under the terms of the 2001 Agreement, the Court does not consider amounts in salary or wages changes as evidence of any mutual rescission. The Court, however, does consider changes in salary structure, duties and title during the course of the employment relationship as the 2001 Agreement does not envision these changes. That is, putting aside the changes in the amount of salary or wages, there nonetheless appears to have been significant changes in Bales's employment duties, title and salary structure since he started at Foilmark to constitute a material change in employment.

During the course of Bales's nearly two-decade employment since entering into the 2001 Agreement, he went through multiple job duty restructurings. D. 14-4 ¶¶ 8-12, 22. One of the more significant being the addition of California as a sales territory on March 22, 2013 when he received a salary restructuring to a new base salary with a commission amount of 2% on foil product sales and 1% on lamination product sales. D. 14-4 ¶¶ 11-12. These changes are relevant indicia of Bales's material employment change. See T.H. Glennon Co., Inc. v. Monday, No. 18-cv-30120-WGY, 2020 WL 1270970, at *6 (D. Mass. Mar. 17, 2020) (explaining that "[c]ourts

have found a material change to exist when an employer substantially changed a salesman's territory and compensation . . . when an employee gained new job titles, responsibility, and increased compensation") (citations omitted). ITW requested, and Bales did sign, the 2013 Agreement memorializing these changes. D. 14-1. This new agreement further highlights that the parties intended to enter a new employment relationship. The 2013 Agreement makes no reference to any prior agreements and includes an integration clause stating that the 2013 Agreement "constitutes the entire agreement of the parties and supersedes all prior agreements, understandings and contracts between the parties with respect to the subject matter hereof." D. 14-1 at 5

Defendants argue that the inclusion of the integration provision in the 2013 Agreement establishes that the parties abandoned the 2001 Agreement. D. 14 at 9-10. Such clauses are ordinarily given full effect, but the "effect of such a clause depends on the breadth and specificity of its terms." City of Bos. v. Labor Relations Comm'n, 48 Mass. App. Ct. 169, 174 (1999). The 2013 Agreement also states in the recitals that it "is intended to complement and will not supersede or replace any of the terms or conditions of the EMPLOYEE's employment" otherwise agreed by the parties. D. 14-1 at 2.

ITW argues that the 2013 Agreement's subject matter is limited to compensation and the integration clause applies only to the subject matter of the contract. D. 25 at 1-2. Accordingly, ITW argues, reading the integration clause, recitals and the 2013 Agreement as a whole demonstrates that the 2013 Agreement was intended to complement and not supersede the 2001 Agreement. D. 25 at 2. Indeed, the 2013 Agreement is entitled the "Employee Commission Agreement," suggesting that the subject matter, and therefore the integration clause, is limited to commission only. D. 14-1 at 2.

The terms of the 2013 Agreement, however, are much broader, see D. 14-1 at 3-8, suggesting that the 2013 Agreement's subject matter applies to employment generally. Rather than focusing solely on compensation as ITW argues, the 2013 Agreement covers multiple aspects of Bales's employment with ITW including services to be rendered, territories, length of the relationship, allocation of taxes and insurance between the parties, terms of termination and leave of absences. D. 14-1 at 3-8. For a few examples, it provides the services to be rendered, territories covered and specifies the accounts for which Bales was responsible. D. 14-1 at 3-4. It further includes details that the agreement will be month to month and provides for written notice of changes in territories: "[i]n the event territories are adjusted [ITW] will provide [Bales] with written notice prior to renew of the terms of this Agreement." D. 14-1 at 3-4. The 2013 Agreement also includes a provision regarding the means of termination, a provision for any leave of absence and a modification clause that outlines the procedure for any modification. D. 14-1 at 4-6. The terms of the agreement demonstrate that the parties intended to enter into a new employment agreement and the subject matter of the 2013 Agreement, contrary to ITW's contentions, was not solely compensation, but rather conditions of the employment relationship more generally. To the extent the recitals state that the 2013 Agreement was intended to complement other agreements, "the preamble cannot change the basic terms of the contract," Fenoglio v. Augat, 50 F. Supp. 2d 46, 57 (D. Mass. 1999), and here the integration clause states that the 2013 Agreement constitutes the entire agreement.

Moreover, even if this Court assumes there is ambiguity in the 2013 Agreement, the canon that this Court must construe the contract against the drafter combined with the fact that the 2001 Agreement was not referenced, further supports the contention that the parties abandoned the 2001 Agreement. "Massachusetts law construes ambiguous contractual language against the

drafter." ER Holdings, Inc. v. Norton Co., 735 F. Supp. 1094, 1100 (D. Mass. 1990) (citations omitted). "Indeed, the drafter of an ambiguous term is generally held to any reasonable interpretation attributed to it by the nondrafting party." Id. (citing Merrimack Valley Nat'l Bank v. Baird, 372 Mass. 721, 724 (1977)). Here, there was neither reference to the 2001 Agreement in the terms themselves nor the negotiations, D. 14-4 ¶ 13; D. 14-1, further supporting the reasonable interpretation by Bales that the contract constituted a new employment relationship. See Athenahealth, Inc. v. Cady, No. 13-1098-BLS1, 2013 WL 4008198, at *7 (Mass. Super. Ct. May 2, 2013) (finding it significant that the parties entered into a new agreement that made no references to the previous agreement).

Subsequent changes in Bales's employment and ITW's actions surrounding Bales's departure, further suggests that the parties abandoned the 2001 Agreement. In mid-2018, Bales began training in the ITW Security Division, which focuses on the sales of products to produce secure and distinct identification cards, passports and visas. D. 14-4 ¶¶ 17-18. Bales transferred to this division in January 2019. D. 14-4 ¶ 22. His work in the ITW Security Division was different from his work in the Foils Division: there were no overlapping customers, products or business, and as a result he had no business contacts with ITW Foil customers. D. 14-4 ¶ 28. ITW changed Bale's job description in accordance with this change. D. 14-4 ¶ 24.

Around the same time ITW altered its compensation structure for all sales employees. D. 14-4 ¶ 15. Effective December 31, 2018, Bales's compensation was changed to a different base salary with a sales incentive bonus program. D. 14-4 ¶ 15. While the compensation structure change and job division change may have been unrelated, the net result is that for Bales's last year of employment he worked in a different division, selling different products to different customers under a different pay structure than he had worked in when he entered into the 2001

Agreement. These changes further indicate a material change in the employment agreement. See Cypress Grp., Inc., 2004 WL 616302, at *4 (declining to enjoin employees and enforce non-compete agreements against former employers because they had signed these agreements when they joined the company but were subsequently promoted to manager and senior counselor and were not asked to sign subsequent agreements); Intepros, Inc. v. Athy, No. MICV201300214F, 2013 WL 2181650, at *5 (Mass. Super. May 5, 2013) (declining to enter a preliminary injunction enforcing a non-compete that the employee had signed when joining the company nearly fifteen years earlier because the employee went through multiple job description, and title changes and had never been asked to sign a subsequent non-compete).

Moreover, ITW's conduct is inconsistent with the belief that the 2001 Agreement was operative. Although ITW requested that Bales certify and reaffirm each year from 2005-2019 his compliance with ITW's Statement of Principles, including the obligation to protect ITW's confidential information, D. 5-1 at 4, 11, at no point did ITW request Bales to certify or reaffirm compliance with the 2001 Agreement, D. 14-1 ¶¶ 6, 13. Upon his resignation in January of this year, no supervisor or manager discussed his obligations under the 2001 Agreement. D. 14-4 ¶ 31. When Bales departed ITW, he requested Human Resources provide him with all copies of any agreements he had with ITW during his employment. 14-4 ¶ 33. He was not provided with the 2001 Agreement at this time. 14-4 ¶ 33. This conduct is consistent with the intention that the 2001 Agreement was not in effect and further supports Bales's argument that the parties had abandoned the 2001 Agreement. F. A. Bartlett Tree Expert Co., 353 Mass. at 588 (declining to enforce a contract where the parties' actions were inconsistent with the belief that that contract was valid). It was not until March when ITW sought to invoke the 2001 Agreement, D. 5-1, after

learning that Bales had moved to a competitor and had been in contact with some ITW customers, D. 8 ¶¶ 6-7, that ITW provided Bales with the 2001 Agreement.

For all of these reasons, the Court cannot say that on this record, ITW has demonstrated a likelihood that the 2001 Agreement was operative at the time of Bales's departure from the company. See Sodexo Operations, LLC. v. Abbe, 382 F. Supp. 3d 162, 166 (D. Mass. 2019) (denying the motion for preliminary injunction and noting explaining that "defendants' material change argument casts doubt on plaintiff's likelihood of success on the merits and is one more reason injunctive relief would be inappropriate here").

### 2. *Likelihood of Success against Univacco*

ITW also contends that it will succeed on its claim against Univacco for tortious interference with contractual relations. D. 4 at 17-18. To establish an intentional interference with contractual or advantageous relations claim, ITW must prove: (1) an advantageous relationship with a third party; (2) that the Defendants knowingly induced the third party to break the contract; (3) improper motive or means; and (4) harm caused by the Defendants' actions. Blackstone v. Cashman, 448 Mass. 255, 260 (2007). ITW asserts that it is likely to succeed on the merits of its intentional interference with contractual relations claims against Univacco by arguing that Univacco employed Bales in a competitive position with ITW to divert business away from ITW. D. 4 at 17-18. A competitor's knowing inducement of an employee to break a restrictive covenant with his or her employer-competitor for the purpose of soliciting a competitor's clients can give rise to an intentional interference claim. Cf. W.B. Mason Co., Inc. v. Staples, Inc., No. 00–5042 BLS, 2001 WL 227855, at *8 (Mass. Super. Ct. Jan. 18, 2001) (finding that an intentional interference claim was likely to succeed, in part on the basis that the defendants, who were aware that the plaintiffs' employees were subject to restrictive covenants,

offered them employment and then advised them to immediately start calling on their former clients).

As a preliminary matter, regarding ITW's tortious interference claim based on Bales's 2001 Agreement, ITW has not shown a likelihood of success because, as explained above, it has not shown a likelihood that the 2001 Agreement was operative at the time of Bales's departure. See Intertek Testing Servs. NA, Inc., 2000 WL 1473126, at *10 (holding that because plaintiffs had not proven their breach of contract claim they had correspondingly not proven their tortious interference claim). Here, moreover, ITW has not established an improper motive. ITW argues that Univacco's improper motive was to solicit business away from ITW through the use of ITW's goodwill and confidential information, D. 4 at 18, but ITW has not identified any specific confidential information that Univacco misappropriated. Univacco submitted the affidavit of Christopher Corbett, the president of Univacco, stating that at no point did the company ask, request or instruct Bales to share any confidential information, nor did Bales ever do so. D. 14-5 ¶ 19. Corbett attests that he instructed Bales prior to his employment that he was to return all confidential information to ITW and should not disclose any to Univacco. D. 14-5 ¶ 20.

To the extent ITW's claim relies upon Univacco's solicitation of customers, it has failed to establish that this solicitation is improper. Univacco and ITW were competitors in the foil industry and shared some of the same customers before Bales began working at Univacco. D. 14-5 ¶¶ 10-13. This solicitation is improper only if the non-solicitation provisions of the 2001 Agreement were enforceable, but as this Court concluded above, ITW cannot demonstrate that they were at this stage. See Protégé Software Servs., Inc. v. Colameta, No. CIV.A. 09-03168, 2012 WL 3030268, at *11 (Mass. Super. July 16, 2012) (explaining that a breach of a non-solicitation provision only constitutes improper means if based on a valid and enforceable non-

solicitation contract). For these reasons, ITW has not established a likelihood of success on the merits for its claims against Univacco.

### B. Irreparable Harm, Balance of Harms and Public Interests

Given the Court's conclusion that ITW has not established a likelihood of success on the merits, it need not discuss the remaining factors for injunctive relief, namely the likelihood of irreparable harm, the balance of equities, or whether the requested injunctive relief would comport with the public interest. New Comm Wireless Servs., Inc., 287 F.3d at 9. In the interest of completeness, however, the Court will address the additional factors, none of which tip in ITW's favor.

ITW argues that it will suffer irreparable harm if an injunction is not issued because the non-compete agreement was designed to protect confidential information, D. 4 at 18, but this argument is undercut by the failure to provide Bales with the 2001 Agreement upon his departure and delay in seeking relief. Gorman v. Coogan, 273 F. Supp. 2d 131, 134 (D. Me. 2003) (noting that "[p]reliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights. Delay in seeking enforcement of those rights . . . tends to indicate at least a reduced need for such drastic, speedy action") (internal citation and quotation marks omitted). Bales was employed by Univacco beginning January 27, 2020 and ITW learned of this employment at the latest about two weeks later on February 11, 2020, D. 8 ¶ 6, but did not contact Bales until March 4, 2020. D. 5-1. While this brief delay in pursuing relief alone does not demonstrate a lack of irreparable harm, this delay combined with the fact that ITW did not invoke the 2001 non-compete provisions upon Bales's departure, D. 14-4 ¶ 31, nor provide him with the 2001 Agreement after he requested the operative agreements, D. 14-4 ¶ 33,

undermines ITW's contention that it will suffer irreparable harm in the absence of the injunctive relief it seeks now.

Moreover, the argument that ITW could suffer irreparable harm from a former employee working at Univacco is further undercut by the nature of the information Bales allegedly possesses. Bales did not work in the ITW Foils Division for a year prior to his departure from ITW, during which time he had no contact with foil clients and did not work with ITW foil products and, therefore, any ITW Foils Division specific information Bales possessed at the time of his departure was a year old. D. 14-4 ¶¶ 22-29. ITW asserts that the information Bales possesses remains commercially viable for between three and five years, D. 6 ¶ 13, but the non-compete it seeks to enforce precludes competition for one year, D. 6-1 at 3-4, suggesting that amount of time sufficient to protect ITW's interests in same is shorter than alleged. Bales attests that the only customers he contacted were those with preexisting business relationships with Univacco and further attests that he has returned all ITW issued devices, removed all ITW proprietary information and otherwise attests the he has not retained, provided or otherwise disclosed any ITW proprietary information. D. 14-4 ¶¶ 34-35, 39-40. Accordingly, the Court does not conclude that ITW has shown that it will suffer irreparable harm if the Court denies its motion for injunctive relief.

As to the balance of harms and public interest, both favor Defendants. Entering a preliminary injunction would disproportionately burden Bales and Univacco. It would preclude Bales from working for Univacco in any capacity, as Defendants argued at the motion hearing, while also preventing Univacco from selling products to its preexisting customers, D. 14-5 ¶ 18. Accordingly, neither factor weighs in favor of the injunctive relief that ITW seeks.

**VI.     Conclusion**

For the above reasons, the Court DENIES ITW's motion for injunctive relief.  D. 3.

**So Ordered.**

/s/ Denise J. Casper<br>United States District Judge